**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Crishanna A. Satterwaite, | ) | No. CV 09-01974-PHX-EHC |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| Michael J. Astrue, Commissioner of Social Security, | ) | |
| Defendant. | ) | |

This is an action for judicial review of a denial of disability insurance benefits under the Social Security Act, 42 U.S.C. § 405(g). The matter is fully briefed (Doc. 21, 24 & 30).

Plaintiff applied for disability benefits in August 2006 (Doc. 12  - Administrative Record [Tr.] ) at approximately 26 years of age (Tr. 96-100). Plaintiff alleged an onset of disability beginning September 1, 2005 (Tr. 96-100). Plaintiff is insured for benefits through December 31, 2011 (Tr. 15). The Administrative Law Judge ("ALJ") listed Plaintiff's severe impairments as fibromyalgia,[1] plus mental impairments in the form of dysthymia (chronic

---

[1]Fibromyalgia is a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments and other tissue. Common symptoms include chronic body pain, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate pain and fatigue (Doc. 21 at 6 n.7). See Benecke v. Barnhart, 379 F.3d 587, 589 (9th Cir. 2004). Fibromyalgia is a "syndrome of chronic pain of musculoskeletal origin but uncertain cure." Stedman's Medical Dictionary, at 671 (27th ed. 2000).

depression) and general anxiety disorder, and "hypertension, well controlled" (Tr. 17). Plaintiff's past relevant work was listed as pharmacy technician and cashier checker, both light exertional level, semi-skilled (Tr. 23). Plaintiff graduated from high school and completed two years of college (Tr. 29-30).

Plaintiff's application was denied initially and upon reconsideration. After a hearing before an ALJ (Tr. 25-44), Plaintiff's application was denied (Tr. 12-24). The Social Security Appeals Council denied Plaintiff's request for review (Tr. 1-4), which was a final decision.

Plaintiff filed her Complaint in this Court on September 21, 2009 (Doc. 1). Defendant filed an Answer on December 18, 2009 (Doc. 11).

**I.**

Standard of Review

A person is "disabled" for purposes of receiving social security benefits if he or she is unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be  expected to last for a continuous period of at least twelve months. Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992). Social Security disability cases are evaluated using a five-step sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520 and 416.920 to determine whether the claimant is disabled. The claimant has the burden of demonstrating the first four steps. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).

In the first step, the ALJ must determine whether the claimant currently is engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied.

If the claimant is not currently engaged in substantial gainful activity, the second step requires the ALJ to determine whether the claimant has a "severe" impairment or combination of impairments which significantly limits the claimant's ability to do basic work activities; if not, a finding of "not disabled" is made and the claim is denied.

If the claimant has a "severe" impairment or combination of impairments, the third step requires the ALJ to determine whether the impairment or combination of impairments meets

- 2 -

1   or equals an impairment listed in the regulations; if so, disability is conclusively presumed and
2   benefits are awarded.

3       If the impairment or impairments do not meet or equal a listed impairment, the ALJ
4   will make a finding regarding the claimant's "residual functional capacity" based on all the
5   relevant medical and other evidence in the record.  A claimant's residual functional capacity
6   ("RFC") is what he or she can still do despite existing physical, mental, nonexertional and
7   other limitations.  Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

8       At step four, the ALJ determines whether, despite the impairments, the claimant can
9   still perform "past relevant work"; if so, the claimant is not disabled and the claim is denied.
10   The claimant has the burden of proving that he or she is unable to perform past relevant work.
11   If the claimant meets this burden, a prima facie case of disability is established.

12       The Commissioner bears the burden as to the fifth and final step in the analysis  of
13   establishing that the claimant can perform other substantial gainful work. The Commissioner
14   may meet this burden based on the testimony of a vocational expert or by reference to the
15   Medical-Vocational Guidelines.  Tackett, 180 F.3d at 1099.

16       The Court has the "power to enter, upon the pleadings and transcript of record, a
17   judgment affirming, modifying, or reversing the decision of the Commissioner of Social
18   Security, with or without remanding the cause for rehearing."  42 U.S.C. § 405(g). The
19   decision to deny benefits should be upheld unless it is based on legal error or is not supported
20   by substantial evidence. Ryan v. Commissioner of Social Security, 528 F.3d 1194, 1198 (9th
21   Cir. 2008).  Substantial evidence means "such relevant evidence as a reasonable mind might
22   accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91
23   S.Ct. 1420, 1427 (1971). "Substantial evidence is more than a mere scintilla but less than a
24   preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n. 1 (9th Cir. 2005) (internal
25   quotation marks and citation omitted). The Court must consider the record in its entirety and
26   weigh both the evidence that supports and the evidence that detracts from the Commissioner's
27   conclusion. Jones v. Heckler, 760 F.2d 993, 995 (9th Cir.1985).

28

**II.**

Background Facts

In August 2005, Plaintiff was examined by Allan M. Block, M.D., a neurologist, for neck pain with a past history of hypertension, depression and panic attacks (Tr. 223-225). Upon examination, including an MRI scan in September 2005 that was unremarkable, Dr. Block referred Plaintiff to a rheumatologist for a fibromyalgia evaluation (Tr. 226).

(A)    Plaintiff's 2005-2006 Medical Records

Plaintiff was examined and treated by Francis A. Nardella, M.D., a rheumatologist. During her initial visit on September 26, 2005, Plaintiff reported chronic pain, fatigue, sleep problems and a history of abuse (Tr. 270).   A physical exam was normal except for "markedly" tender points in six different body areas (Tr. 271).   Dr. Nardella diagnosed fibromyalgia with associated chronic fatigue, sleep disorder, chronic headaches and chronic generalized musculoskeletal pain (Tr. 271-272).   Dr. Nardella noted Plaintiff's history of anxiety and depression (Tr. 272).    Plaintiff continued her current medications of antidepressants and pain relievers (Tr. 272).   In October/November, 2005, Dr. Nardella included active anxiety and depression in Plaintiff's diagnosis, recommended that Plaintiff see a psychiatrist and referred Plaintiff to a pain management center (Tr. 266, 267, 268).

In December 2005, Stephen D. Glacy, M.D., of the Arizona Pain Clinic (Tr. 230-238), diagnosed Plaintiff with fibromyalgia (noting 12 tender points)and depression, as diagnostic tests of the spine and head were normal (Tr. 230, 235-237, 241-243). Dr. Glacy reported that Plaintiff had positive Waddell signs indicating an exaggerated response (Tr. 237).  Dr. Glacy prescribed antidepressants and follow-up with her treating physician and a psychologist, and recommended oral medications, physical therapy and interventional pain procedures (Tr. 231-232, 237).

In December 2005, Plaintiff returned to Dr. Nardella who diagnosed Plaintiff as having fibromyalgia (with chronic generalized musculoskeletal pain, fatigue, sleep disorder, chronic headaches, positive tender points) and "extremely active" anxiety and depression and adjusted

1  Plaintiff's medications (Tr. 265).  Plaintiff continued to be seen by Dr. Nardella mid-January,

2  March, April and May 2006; tender point examination results ranged from moderately to

3  markedly positive for pain (Tr. 255, 257, 259, 261 & 263). During Dr. Nardella's

4  examinations of Plaintiff in July and August 2006, Plaintiff reported increased pain and

5  anxiety regarding her fibromyalgia (Tr. 251-253). In September 2006, Dr. Nardella reported

6  that Plaintiff's fibromyalgia was active but improved and that her pain reliever was more

7  helpful but she complained of more fatigue (Tr. 249-250).

8       On September 25, 2006, Dr. Nardella completed a "Medical Source Statement Of

9  Ability To Do Work Related Activities (Mental)" (Tr. 244-248), noting a diagnosis of

10  fibromyalgia, anxiety and depression (Tr. 244). Plaintiff was "markedly limited" in her ability

11  to perform activities within a schedule and maintain regular attendance; to sustain an ordinary

12  routine without special supervision; to complete a normal workday and workweek without

13  interruptions from psychologically based symptoms and to perform at a consistent pace

14  without an unreasonable number and length of rest periods (Tr. 244-248).

15  (B)   Consultative Examinations - 2006

16       In November 2006, Malcolm McPhee, M.D., conducted a consultative examination

17  (Tr. 338-339). Plaintiff had multiple tender areas upon palpation.  Other tests noted positive

18  results such as normal gait and range of motion, ability to rise from a seated position, etc. (Tr.

19  338).  Dr. McPhee's impression was reported as "multiple tender points in a fibromyalgia

20  pattern" and associated fatigue (Tr. 339).

21       In November 2006, Elliot D. Salk, Ph.D., conducted a consultative mental status

22  examination (Tr. 283-293) and reported that Plaintiff appeared depressed and anxious, but was

23  not delusional, paranoid, manic or psychotic (Tr. 292).  Dr. Salk diagnosed Plaintiff with

24  dysthymic disorder (chronic mood disorder) and generalized anxiety disorder (Tr. 293).

25  According to Dr. Salk's report, Plaintiff said she ran errands, such as going to the grocery

26  store, pet store,  and gas station 2 to 3 times a week, did all the chores such as laundry loads,

27  mopping, washing dishes and cleaning the kitchen and bathroom, cared for her pets including

28

1  taking her dog out hourly and cleaning the litter box, prepared about 3 simple meals daily,
2  read approximately 3 hours, enjoyed cross-stitching, and met friends for lunch 3 to 4 times
3  a month  (Tr. 291).  Plaintiff said that after a strenuous day, she lay on the couch for the next
4  1 to 2 days (Tr. 291).

5      Dr. Salk completed a "Medical Source Statement Of Ability To Do Work Related
6  Activities (Mental)" (Tr. 283-287). Dr. Salk noted that Plaintiff overall was not significantly
7  limited but that she was moderately limited in her ability to perform activities within a
8  schedule and maintain regular and punctual attendance, to complete a normal workday and
9  workweek, etc., and in her ability to accept instructions and respond appropriately to criticism
10 from supervisors (Tr. 283-287).

11 (C)   State Agency Review Reports - 2006

12      In December 2006, Howell R. Warren, M.D., a State Agency psychiatrist, reviewed
13 Plaintiff's medical records and assessed Plaintiff as having depression, dysthymic disorder
14 and generalized anxiety disorder that did not meet the listing requirements (Tr. 299-312 [302,
15 304]).  Dr. Warren found that Plaintiff had mild limitations in activities of daily living and
16 maintaining social functioning; moderate limitations in maintaining concentration, persistence
17 or pace; and no episodes of decompensation (Tr. 309).  Dr. Warren found that Plaintiff had
18 one moderate limitation in understanding and memory; no more than moderate limitations
19 regarding sustained concentration and persistence; and no limitation regarding interaction and
20 adaptation (Tr. 295-296).  Based in part on Dr. Salk's report, Dr. Warren concluded that
21 Plaintiff was capable of understanding and remembering simple and detailed instructions,
22 maintaining attention and concentration for periods of at least 2 hours for simple tasks,
23 relating appropriately to peers and supervisors, and adapting to routine workplace changes
24 (Tr. 297).

25      Also in December 2006, Ray Hughes, M.D., a State Agency physician, assessed
26 Plaintiff's ability to perform work-related physical activity (Tr. 313-320) and found that
27 Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or

28                                          - 6 -

1  walk a total of 6 hours in an 8-hour workday; and, sit a total of 6 hours during an 8-hour

2  workday (Tr. 314-315, 320).  Dr. Hughes assessed that Plaintiff had the ability for unlimited

3  pushing and/or pulling; climbing ramps and stairs, stooping, kneeling, crouching, and

4  crawling occasionally but never climbing ladders, ropes and scaffolds; and balancing

5  frequently (Tr. 314-315, 320).  Plaintiff had no manipulative, visual, communicative or

6  environmental limitations (Tr. 316-317). Dr. Hughes commented that "[f]ibromyalgia/fatigue

7  should not limit sitting to 'less than 6 hrs in 8 hr day'" (Tr. 320).

8  (D)     Plaintiff's 2007 Medical Records

9         In February 2007, Dr. Nardella noted that Plaintiff's fibromyalgia showed

10  improvement even though Plaintiff complained of increased pain and fatigue and a "tender

11  point" examination was "positive" for pain in several areas (Tr. 324-325).  In May 2007, Dr.

12  Nardella made a similar report that Plaintiff's fibromyalgia was improved following a tender

13  point examination that was markedly positive for pain (Tr. 362).  Plaintiff reported that she

14  was coping with the pain (Tr. 362).  On May 24, 2007, Dr. Nardella completed a "Medical

15  Source Statement Of Ability To Do Work Related Activities (Physical)" and listed Plaintiff's

16  diagnoses as fibromyalgia, anxiety and depression (Tr. 321-323).  Dr. Nardella indicated that

17  Plaintiff was capable of lifting and/or carrying 20 pounds occasionally and less than 10

18  pounds frequently; standing and/or walking less than 2 hours during an 8-hour day; and,

19  sitting less than 6 hours in an 8-hour day.  Dr. Nardella reported that Plaintiff had the ability

20  to climb ramps and stairs, balance, stoop, kneel, crouch and crawl occasionally but never

21  climb ladders, ropes and scaffolds.  Plaintiff also could perform frequent manipulation, had

22  no visual or communicative limitations but had several environmental restrictions (Tr. 322-

23  323).

24         In early July 2007, Plaintiff sought treatment from Sandra Garred, M.D., of Advanced

25  Cardiac Specialists (Tr. 327).  An examination revealed signs of depression but not significant

26  signs of anxiety (Tr. 328).  Dr. Garred diagnosed Plaintiff with fibromyalgia with chronic

27  neck, upper back, and shoulder pain and prescribed a new pain medication (Darvon) (Tr. 328).

28

- 7 -

1   A cervical spine MRI scan on July 20, 2007 showed neuroforaminal stenosis (narrowing of
2   the opening through which the spinal nerve passes as it exits the spine) (Tr. 330-331; Doc. 24
3   at 10).

4          On July 30, 2007, Dr. Nardella's tender point examination of Plaintiff was markedly
5   positive for pain in most areas (Tr. 360-361).  Plaintiff's fibromyalgia remained "active but
6   improved", her "anxiety and depression" were noted as "active", and her medication was
7   adjusted.

8          In August 2007, Dr. Nardella completed a check-box style "Fibromyalgia Residual
9   Functional Capacity (RFC) Questionnaire" (Tr. 333-335) that included Plaintiff's other
10  diagnoses as anxiety and depression (Tr. 333).  Dr. Nardella indicated that Plaintiff had severe
11  pain and moderately severe fatigue; Plaintiff's pain and/or fatigue would frequently interfere
12  with her attention and concentration; and that Plaintiff would frequently experience
13  deficiencies of concentration, persistence or pace that would result in her failure to complete
14  tasks in a timely manner.  Dr. Nardella expressed the opinion that Plaintiff would be unable
15  to sustain work on a regular and continuing basis (Tr. 334-335).

16         In August 2007, Plaintiff was examined by Dr. Garred who reported that Plaintiff had
17  significant upper neck and back pain as well as low back pain but that her pain seemed out
18  of proportion to the examination findings (Tr. 375-376).  Further diagnostic testing was
19  normal showing no neuroforaminal stenosis as previously indicated (Tr. 369, 372).  A lumbar
20  spine MRI scan showed minimal foraminal narrowing and an arachnoid cyst (Tr. 374).  In
21  September 2007, Dr. Garred concluded that Plaintiff's spine was normal except for the
22  asymptomatic cyst and that Plaintiff's symptoms were related to her fibromyalgia and history
23  of abuse (Tr. 369-370). Dr. Garred reported that she was "more convinced" that "this is
24  fibromyalgia" and that Plaintiff's fibromyalgia was "significant for upper neck and back pain"
25  (Tr. 370).  Dr. Garred adjusted Plaintiff's medication and referred her to a psychologist (Tr.
26  370).

27

28

1    In September 2007, Thomas Glodek, M.D., and Adrianne Gallucci, Psy.D., State

2    Agency doctors, reviewed the record upon a reconsideration review process (Tr. 336-337).

3    Drs. Glodek and Gallucci agreed with the previous opinions (of Drs. Warren and Hughes)

4    concerning Plaintiff's mental and physical abilities.

5    In October 2007, Dr. Nardella's tender point examination of Plaintiff was "positive"

6    for pain in most areas (Tr. 358).  Dr. Nardella concluded that Plaintiff's fibromyalgia was

7    "active but improved" and adjusted her medications (Tr. 358-359).

8    In November 2007, Plaintiff reported to Randall W. Porter, M.D., for a neurosurgical

9    consultation at Dr. Garred's request (Tr. 349-352).  A physical examination was normal

10   except for showing that Plaintiff had some pain in her neck during a range of motion test and

11   tenderness and limited range of motion in her back (Tr. 351).  Dr. Porter diagnosed Plaintiff

12   with fibromyalgia with pain in both arms and legs (Tr. 351) and recommended epidural

13   injections, physical therapy, and/or chiropractic manipulation (Tr. 352).

14   (E)    Plaintiff's 2008 Medical Records

15   In February 2008, Dr. Nardella reported that a tender point examination of Plaintiff

16   was markedly positive for pain in most areas but did not increase Plaintiff's pain medication

17   (Tr. 356-357).  Plaintiff's fibromyalgia, anxiety and depression remained active (Tr. 356).

18   In June 2008, Dr. Nardella's examination of Plaintiff indicated mildly positive for pain

19   in various areas and Plaintiff's medication was adjusted and a sleep study recommended (Tr.

20   354-355).  Plaintiff's fibromyalgia remained active in terms of sleep, pain and fatigue (Tr.

21   354).  Plaintiff's anxiety and depression remained active (Tr. 354).

22   In October 2008, Plaintiff complained to Dr. Nardella of extreme fatigue and pain (Tr.

23   389).  A tender point examination was "mildly positive" for pain in various areas (Tr. 389).

24   Dr. Nardella concluded that Plaintiff's fibromyalgia remained active and that her anxiety and

25   depression were stable (Tr. 389).  Plaintiff's current medication was maintained (Tr. 389).

26   On October 23, 2008, Dr. Nardella completed a check-box style "Pain Functional

27   Capacity (RFC) Questionnaire" and a "Fibromyalgia Residual Functional Capacity (RFC)

28

Questionnaire" (Tr. 381-385).  On the pain RFC questionnaire, Dr. Nardella indicated that Plaintiff had moderately severe pain (Tr. 381).  On the fibromyalgia RFC questionnaire, Dr. Nardella listed Plaintiff's other diagnoses as anxiety and depression (Tr. 383) and indicated that Plaintiff's pain was severe (Tr. 384).  Dr. Nardella indicated on both questionnaires that Plaintiff's pain and/or fatigue was sufficiently severe to constantly interfere with Plaintiff's attention and concentration and would cause her to experience constant deficiencies of concentration, persistence or pace resulting in Plaintiff's failure to complete tasks in a timely manner (Tr. 381-382, 385). Dr. Nardella expressed the opinion in the fibromyalgia questionnaire that Plaintiff would not be able to sustain work on a regular and continuing basis (Tr. 385).

On October 23, 2008, Dr. Nardella completed a "Medical Assessment Of Ability To Do Work Related Physical Activities" check-box style questionnaire (Tr. 386-388). Dr. Nardella expressed the opinion that Plaintiff was capable of lifting/carrying less than 10 pounds frequently or occasionally; standing and/or walking less than 2 hours during an 8-hour workday; and sitting less than 6 hours during an 8-hour workday.  Plaintiff could never engage in postural activities and had numerous manipulative and environmental limitations (Tr. 387-388).

Plaintiff's medications over the course of her treatment included Zoloft (antidepressant), Lisinopril ( hypertension), Wellbutrin (antidepressant), Lorazepam (anxiety), Nabumetone (pain, anti-inflammatory), Carisoprodol (muscle relaxant), Skelaxin (pain, muscle relaxer), Hydrocodone (pain), Levbid, Lyrica (pain), OxyContin (pain), Topamax (headaches, pain), Neurontin (pain), Trazodone (antidepressant, pain), Cymbalta (pain), Vicodin (pain), Ambien (sleep aid), Phenergan (for nausea), Methadone (pain), Actavir, MS Contin (pain), Chantix, Seroquel (antidepressant), Xanax (anxiety),  Hydroxyzine (anxiety) and Elavil (antidepressant)  (Tr. 270,  269, 266, 265, 263, 261, 262, 257, 324, 358, 356, 355; Doc. 21 at 9; Tr. 37). She reported side-effects (sickness, facial rash, constipation, dizziness, poor sleep) from various of these medications (Tr. 37, 267, 265, 262, 257, 358, 354).

1

**III.**

2

The Hearing Before the ALJ: November 3, 2008

3    Plaintiff testified that she has fibromyalgia, which causes burning pain in her neck and

4    shoulders and continuous body aches, and she is constantly tired (Tr. 32-34).  One of her

5    medications (Methadone) causes drowsiness and difficulty with concentration and memory

6    (Tr. 33-34).  Plaintiff said she cries a lot (Tr. 36).  Antidepressants are not helpful and,

7    although recommended, she is unable to go for counseling on a regular basis (Tr. 37-38).

8    Plaintiff spends much of her day lying on the couch while reading, watching television, using

9    her laptop computer, or sleeping (Tr. 34-35).  If she sits for a few hours or walks, she needs

10   a day to recover, and standing for more than 10 to 15 minutes causes pain, numbness, and

11   tingling in her extremities (Tr. 36-37).  Plaintiff said  she needs to take a lot of breaks.  She

12   performs chores, including unloading the dishwasher, laundry, and dusting, and cooking

13   simple meals  (frozen foods) (Tr. 34-35, 39).  She cannot vacuum (Tr. 39).  Plaintiff drives,

14   shops, and attends weekly Bible study (Tr. 35, 38).  Plaintiff lives with her husband who helps

15   out "with things" (Tr. 35, 37).[2]

16   Mark Kelman, a Vocational Expert ("VE"), described Plaintiff's past relevant work

17   as light, semiskilled occupations of pharmacy technician and cashier checker (Tr. 40).  The

18   VE testified that a person of Plaintiff's age, education and work history, and considering the

19   residual functional capacity described by the reviewing doctors, could perform her past

20   occupations both as she performed them and as they are generally performed in the national

21   economy (Tr. 40).

22   Plaintiff's counsel questioned the VE adding the moderate limitations regarding

23   maintaining scheduled activities, completion of a normal workday and workweek without

24   interruptions from psychologically based symptoms, etc., indicated by the record.  The VE

25

26   ───────────────

27   [2]Plaintiff's husband was deployed to Afghanistan from January 2007 through April 2008 (Tr. 23).

28

1   answered that these particular limitations would preclude Plaintiff's past relevant work and
2   other work (Tr. 42).  The VE also said that all work would be precluded if a person could lift
3   20 pounds occasionally and less than 10 pounds frequently, stand or walk less than 2 hours
4   in an 8-hour day and sit for less than 6 hours in an 8-hour day (Tr. 42-43).  Similarly, work
5   would be precluded regarding a person who suffers from severe pain and moderately severe
6   fatigue that interferes with attention, concentration and persistence of pace resulting in an
7   inability to timely complete tasks (Tr. 43).

8                                                    **IV.**

9                                          The ALJ's Findings

10          In a written decision dated March 31, 2009 (Tr. 12-24), the ALJ found that Plaintiff's
11  combination of impairments (fibromyalgia, hypertension well controlled, dysthymia and
12  general anxiety disorder) cause significant limitation in Plaintiff's ability to perform basic
13  work activities based on the opinions of the State Agency physicians and psychiatrists (Tr.
14  17)(Drs. Warren, Hughes, Glodek and Gallucci).  The ALJ further found that Plaintiff had the
15  physical residual functional capacity expressed by the State Agency assessments as they were
16  consistent with the objective evidence which, based on MRI and other testing, showed
17  Plaintiff's spine and brain to be normal (Tr. 19).    The opinions of the State Agency
18  physicians  other than Dr. McPhee were credited and resulted in a finding that Plaintiff could
19  perform light work (Tr. 19-20).

20          The ALJ rejected the opinion of Dr. Nardella, Plaintiff's treating physician, as not
21  supported by the objective medical or treatment evidence; as showing minimal treatment
22  notes; and as nothing more than a recording of Plaintiff's subjective complaints and
23  subsequent diagnoses (Tr. 20).  In addition, Dr. Nardella's multiple medical source statements
24  were inconsistent (Tr. 20).  The ALJ credited the opinions of the State Agency psychiatrists
25  regarding Plaintiff's mental residual functional capacity assessment as consistent for the most
26  part with the opinion of the consultative psychological examiner Dr. Salk who ultimately
27  concluded that Plaintiff's concentration, persistence and pace appeared within normal limits

28                                                    - 12 -

1   (Tr. 20-21).  The opinions of the State Agency psychiatrists were given more weight than the

2   opinion of Dr. Nardella who is a rheumatologist, not a psychiatrist, and because he did not

3   conduct a mental status examination (Tr. 21).

4        The ALJ found that Plaintiff's medically determinable impairments could reasonably

5   be expected to cause the alleged symptoms but Plaintiff's statements concerning the intensity,

6   persistence and limiting effects of these symptoms were found not credible to the extent they

7   were inconsistent with the ALJ's findings on residual functional capacity (Tr. 21). The ALJ

8   discussed that in December 2005, Plaintiff's doctor noted positive signs for exaggerated

9   response (Tr. 22).  In addition, the medical records showed that Plaintiff had failed to comply

10  with prescribed treatment, Plaintiff's daily living activities were not consistent with the

11  alleged degree of pain and impairment, and Plaintiff had the ability to spend a substantial part

12  of the day in activities involving the performance of functions readily transferable to

13  competitive work (Tr. 22).

14       The ALJ concluded that Plaintiff is able to perform her past relevant work as pharmacy

15  technician and cashier checker and is not disabled. (Tr. 23).

16                                      **V.**

17                                   Discussion

18       Plaintiff contends that the ALJ erred in rejecting the opinions of her treating physician

19  Dr. Nardella, by failing to accord weight to Dr. Salk's opinion when the VE testified that the

20  limitations found by Dr. Salk precluded all work, in rejecting Plaintiff's symptom testimony,

21  and in determining Plaintiff's residual functional capacity based on the assessment forms

22  completed by the State Agency physicians and psychiatrists.  Plaintiff argues in favor of

23  remand for a determination of disability benefits.  Defendant argues that the ALJ's decision

24  should be affirmed or, in the alternative, the case should be remanded for further proceedings.

25       "By rule, the Social Security Administration favors the opinion of a treating physician

26  over non-treating physicians."  See Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) (citing

27  20 C.F.R. § 404.1527).  An ALJ's finding that a treating source medical opinion is not well-

28                                    - 13 -

1  supported by medically acceptable evidence or is inconsistent with substantial evidence in the

2  record means only that the opinion is not entitled to controlling weight, not that the opinion

3  should be rejected.  See Orn, 495 F.3d at 632-633. Where a treating doctor's opinion is

4  uncontradicted, an ALJ may reject it only for "clear and convincing" reasons; however, a

5  contradicted opinion of a treating or examining physician may be rejected for "specific and

6  legitimate" reasons.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995). "The opinion

7  of a non-examining physician cannot by itself constitute substantial evidence that justifies the

8  rejection of the opinion of either an examining or treating physician"; such an opinion may

9  serve as substantial evidence only when it is consistent and supported by other independent

10  evidence in the record.  Lester, 81 F.3d at 830-831.

11        The Court finds that the ALJ erred in rejecting Dr. Nardella's opinion as lacking

12  objective medical evidence. Fibromyalgia is a disease that eludes objective evidence.

13  Benecke v. Barnhart, 379 F.3d 587, 590, 594 (9th Cir. 2004)("[f]ibromyalgia's cause is

14  unknown, there is no cure, and it is poorly-understood within much of the medical

15  community"). The opinion of a rheumatologist, such as Dr. Nardella, is given greater weight

16  than those of other physicians because it is an opinion of a specialist about medical issues

17  related to the doctor's area of specialty.  Benecke, 379 F.3d at 594 n. 4.

18        Dr. Nardella's opinion is supported by the record. In September 2005, Dr. Block, a

19  neurologist, referred Plaintiff to a rheumatologist for a fibromyalgia evaluation (Tr. 226).  In

20  September 2005, Dr. Nardella, a rheumatologist, diagnosed Plaintiff with fibromyalgia based

21  on Plaintiff's complaints of chronic pain, fatigue, sleep problems, a history of abuse and a

22  physical exam that revealed "markedly" tender points in six different body areas (Tr. 271).

23  Dr. Nardella remained Plaintiff's treating physician between September 2005 and October

24  2008. Dr. Nardella's medical reports during this period show tender point examinations of

25  Plaintiff indicating pain of some degree during Plaintiff's numerous consultations (Tr. 271,

26  268, 267, 266, 265, 255, 257, 259, 261, 263, 251, 253, 249, 324, 362, 360, 358, 356, 354,

27  389).

28                                              - 14 -

1    Dr. Nardella's diagnosis of Plaintiff's fibromyalgia was confirmed by Dr. Glacy in

2    December 2005 (Tr. 233-243).  Dr. Garred confirmed Plaintiff's fibromyalgia diagnosis in

3    July 2007 (noting chronic neck, upper back and shoulder pain) (Tr. 328) and in September

4    2007 (noting that Plaintiff's fibromyalgia was "significant for upper neck and back pain") (Tr.

5    370).  In November 2007, Dr. Porter, pursuant to a neurosurgical consultation, diagnosed

6    Plaintiff with fibromyalgia with reported pain in both arms and legs (Tr. 351). In November

7    2006, Dr. McPhee conducted a consultative examination of Plaintiff, noted multiple tender

8    areas upon palpation and reported multiple tender points in a fibromyalgia pattern with

9    associated fatigue (Tr. 338-339).

10    The ALJ also erred in finding that Dr. Nardella's treatment notes were "minimal".  The

11    record contains some 55 pages of medical records concerning 20 evaluations over the

12    approximate three-year period that Dr. Nardella was Plaintiff's treating physician. These

13    medical records show tender point examinations, Plaintiff's reported pain, fatigue, depression,

14    anxiety and other symptoms, and the recommended treatment including prescribed

15    medications, referral to a pain specialist, and laboratory studies (e.g., Tr. 256, 261, 268, 272).

16    Tender point examinations are relevant to the diagnosis of fibromyalgia. Rogers v.

17    Commissioner of Social Security, 486 F.3d 234, 244 (6th Cir. 2007).  The Ninth Circuit has

18    not required documentation of a high level of specificity regarding a fibromyalgia diagnosis.

19    Benecke, 379 F.3d at 590, 594 (holding that ALJ erred in requiring objective evidence for a

20    disease such as fibromyalgia that "is diagnosed entirely on the basis of patients' reports of

21    pain and other symptoms").

22    The ALJ erred in finding that Dr. Nardella's RFC assessments were contradictory.  Dr.

23    Nardella completed RFC questionnaires in September 2006, May 2007,  August 2007 and

24    October 2008 (Tr. 244-248, 321-323, 333-335, 381-388).  Dr. Nardella was consistent in the

25    diagnosis of fibromyalgia, depression and anxiety.   In September 2006, Dr. Nardella

26    expressed the opinion that Plaintiff was "markedly limited" in her ability to perform a

27    scheduled workday and workweek (Tr. 244-248). In August 2007, Dr. Nardella reported that

28                                         - 15 -

1   Plaintiff had severe pain and moderately severe fatigue and opined that she would be unable

2   to sustain work on a regular and continuing basis (Tr. 334-335).   In October 2008, Dr.

3   Nardella reported that Plaintiff had moderately severe to severe pain (Tr. 381, 384), and

4   opined that Plaintiff would not be able to work on a regular and continuous basis (Tr. 385).

5   In another questionnaire dated October 2008 (Tr. 386-388), Dr. Nardella reported Plaintiff's

6   limitations in lifting and/or carrying, in standing and/or walking (less than 2 hours in an 8-

7   hour day) and sitting (less than 6 hours in an 8-hour day) that were consistent with the VE's

8   opinion based on such limitations that all work is precluded (Tr. 42-43).  Dr. Nardella at times

9   reported improvement in Plaintiff's fibromyalgia, anxiety and depression but those reports do

10  not render Dr. Nardella's opinion inconsistent.  Reddick v. Chater, 157 F.3d 715, 724 (9th Cir.

11  1998)(noting that occasional symptom-free periods and even the sporadic ability to work are

12  not inconsistent with disability).

13          The Court finds further error in the ALJ's rejection of Plaintiff's symptom testimony

14  and evidence as not credible. The ALJ found that Plaintiff's medically determinable

15  impairments could reasonably be expected to cause the alleged symptoms (Tr. 21) and no

16  "clearly malingering" (Tr. 22). Unless there is affirmative evidence of malingering, the ALJ's

17  reasons for rejecting the claimant's testimony must be "clear and convincing." Reddick, 157

18  F.3d at 722.   The ALJ must identify what testimony is not credible and what evidence

19  undermines the claimant's complaints.  Id.  The evidence upon which the ALJ relies must be

20  substantial.  Reddick, 157 F.3d at 724.

21          In support of the finding that Plaintiff had declined medical treatment as relevant to the

22  credibility determination, the ALJ cited  a recommended beta blocker by a cardiologist for

23  tachycardia noted in a January 18, 2006 medical report (Tr. 263) and Plaintiff's report to Dr.

24  Nardella on November 30, 2005 that she had discontinued Neurontin because she did not find

25  it helpful (Tr. 266).  With respect to both instances, Plaintiff was taking other medications at

26  the time. Record medical evidence substantiates Plaintiff's numerous consultations with Dr.

27  Nardella and other physicians over a 3-year period, the regimen of pain, antidepressant and

28                                          - 16 -

1  other medications prescribed, and the side-effects she reported from certain of those
2  medications.  The finding that Plaintiff declined medical treatment is not supported by the
3  record.

4         Dr. Glacy's note regarding positive signs for axial loading and exaggerated response
5  (Tr. 237), mentioned by the ALJ (Tr. 22), occurred in December 2005. The overall three years
6  of record medical evidence, however, substantiates Plaintiff's fibromyalgia, pain and fatigue.
7  For example, in August 2007, Dr. Garred noted that Plaintiff's pain seemed out of proportion
8  to the examination findings (Tr. 375-376). After further tests ruled out spine abnormalities,
9  Dr. Garred in September 2007 reported that she was "more convinced" that "this is
10 fibromyalgia" and that Plaintiff's fibromyalgia was "significant for upper neck and back pain"
11 (Tr. 370).

12        The ALJ did not identify any specific inconsistency in Plaintiff's statements regarding
13 her daily activities.  Rather, the ALJ credited Dr. Salk's summary of Plaintiff's report of her
14 daily activities (Tr. 291) as not consistent with the alleged degree of pain and impairment and
15 as tending to show that Plaintiff is able to work if motivated to do so (Tr. 22).  The ALJ found
16 that Plaintiff's activities suggest she has better physical and mental capacities than she stated
17 in her testimony and written statements and that Plaintiff had not been completely frank (Tr.
18 22).

19        Plaintiff described her daily activities as including running errands 2 or 3 times per
20 week, watching television, lying on the couch, performing household chores (laundry, dusting,
21 unloading the dishwasher, mopping), simple meal preparation, driving, grocery shopping,
22 taking the dog outside, reading, cross-stitching,  weekly Bible study and lunch with friends
23 3 to 4 times per month (Tr. 34-39, 130-137, 291). Disability claimants should not be penalized
24 for attempting to lead normal lives in the face of their limitations. Reddick, 157 F.3d at 722.
25 The mere fact that a claimant engages in normal daily activities "does not in any way detract
26 from her credibility as to her overall disability.  One does not need to be 'utterly
27 incapacitated' in order to be disabled."  Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir.

28

1   2001).  Plaintiff testified at the hearing that she has to take "a lot of breaks" and that her
2   husband helps out (Tr. 34, 35, 37).  Plaintiff reported that after a strenuous day she needs a
3   day or two to recover (Tr. 36, 291).

4       Here, the ALJ found that Plaintiff's activities did not by themselves equate with work
5   activity or show the ability to engage in work (Tr. 22).  However, the ALJ then failed to
6   explain how Plaintiff's activities translate into an ability to perform regularly in the
7   workplace.  <u>Orn</u>, 495 F.3d at 639 (the ALJ erred where the claimant's activities did not
8   contradict his testimony and failed to meet the threshold for transferable work skills); 20
9   C.F.R. § 404.1572(c)("[g]enerally, we do not consider activities like taking care of yourself,
10  household tasks, hobbies, ... or social programs to be substantial gainful activity").

11      The ALJ erred in determining Plaintiff's residual functional capacity based on the
12  assessment forms completed by the non-examining State Agency physicians and psychiatrists.
13  Dr. Warren, a State Agency psychiatrist, expressed his RFC opinion based on a diagnosis of
14  depression, dysthymic disorder and generalized anxiety (Tr. 299-312), not fibromyalgia.  Dr.
15  Hughes, a State Agency physician, expressed his RFC opinion based on a diagnosis of
16  fibromyalgia and anxiety and depression, secondary, but with no marked posteral,
17  manipulative, or visual  limitations (except no climbing of ladders, ropes and scaffolds) (Tr.
18  313-320).  Two other State Agency professionals (Drs. Glodek and Gallucci) agreed with
19  these assessments (Tr. 336-337). The ALJ in her RFC determination relied on these opinions
20  as consistent with the "objective evidence" that, based on MRI and other tests, Plaintiff's
21  brain and spine were normal (Tr. 19).  However, fibromyalgia patients may "present no
22  objectively alarming signs" and may "manifest normal muscle strength and neurological
23  reactions and have a full range of motion."  <u>Rogers</u>, 486 F.3d at 243-244(noting that objective
24  tests are of little relevance in determining the existence or severity of fibromyalgia). Given
25  the nature of fibromyalgia, a claimant's subjective complaints of pain are often the only means
26  of determining the severity of a patient's condition and resulting functional limitations.

27

28
                                    - 18 -

1 Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003). The ALJ erred in not taking this

2 into account in relying on these State Agency reports.

3     The ALJ gave more weight to the opinions of the State Agency psychiatrists than to

4 the opinion of Dr. Nardella, a rheumatologist, noting that Dr. Nardella is not a psychiatrist and

5 did not conduct a mental status examination (Tr. 21). However, a treating physician is

6 qualified to give a medical opinion regarding the claimant's mental status as it relates to the

7 claimant's physical disability even though the treating physician is not a psychiatrist. Sprague

8 v. Bowen, 812 F.2d 1226, 1231-1232 (9th Cir. 1987).

9     The Court concludes that the ALJ erred in not affording significant weight to the

10 opinion of Dr. Nardella, Plaintiff's treating physician, regarding Plaintiff's condition and

11 residual functional capacity. The ALJ further erred in assessing the credibility of Plaintiff's

12 symptom evidence and in affording controlling weight to the opinions of non-examining State

13 Agency physicians and psychiatrists. Based on the limitations reported by Dr. Nardella, the

14 VE expressed the opinion that all work is precluded (Tr. 42-43). The Commissioner's

15 ultimate decision to deny Plaintiff's claim for benefits is not supported by clear and

16 convincing or specific and legitimate reasons or substantial evidence in the record.

17     The decision whether to remand for further proceedings or for immediate payment of

18 benefits is within the discretion of the court. Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir.

19 2000). The issue turns on the utility of further proceedings. Remand for an award of benefits

20 is appropriate when the ALJ has failed to provide legally sufficient reasons for rejecting

21 evidence, no outstanding issue remains that must be resolved before a determination of

22 disability can be made, and it is clear from the record that the ALJ would be required to find

23 the claimant disabled were the rejected evidence credited as true. Varney v. Sec'y of HHS,

24 859 F.2d 1396, 1400 (9th Cir. 1988). After applying the credit-as-true rule to improperly

25 credited evidence, no outstanding issue remains to be resolved before determining that

26 Plaintiff is entitled to an award of benefits.

27     Accordingly,

28

1    **IT IS ORDERED** that the decision of the Commissioner denying Plaintiff's claim for

2    benefits is reversed.

3    **IT IS FURTHER ORDERED** that the case is remanded for an award of benefits.

4    **IT IS FURTHER ORDERED** that the Clerk of Court shall enter Judgment

5    accordingly.

6    DATED this 24th day of February, 2011.

7

8

9    _____
                    Earl H. Carroll
10                 United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28